IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

GARY THOUVENELL, §
§
Plaintiff, §
§
v. § 2:12-CV-119
§
CAROLYN W. COLVIN, §
Acting Commissioner of Social Security, §
§
Defendant. §

**REPORT AND RECOMMENDATION
TO AFFIRM DECISION OF THE COMMISSIONER**

Plaintiff GARY THOUVENELL brings this cause of action pursuant to 42 U.S.C. § 405(g),

seeking review of a final decision of defendant CAROLYN W. COLVIN, Acting Commissioner of

Social Security, denying plaintiff's application for disability insurance and supplemental security

income benefits.  For the reasons set forth below, the undersigned United States Magistrate Judge

recommends the Commissioner's decision finding plaintiff not disabled and not entitled to benefits

be AFFIRMED.

I.
BACKGROUND

Plaintiff applied for disability insurance benefits and supplemental security income benefits

in September 2010.  (Transcript [hereinafter Tr.] 122, 123).  Plaintiff alleged he has been unable to

work since June 29, 2008, due to a herniated disc, depression, and heart problems.  (*Id.* 123, 142).

The Commissioner denied benefits initially and upon reconsideration.  (*Id.* 57-60).

Upon plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ). On December 5, 2012, the ALJ rendered an unfavorable decision, finding plaintiff was not disabled and not entitled to benefits at any time relevant to the decision. (*Id.* 27). The ALJ found plaintiff, who was forty-nine years old at the time he filed for benefits, had not engaged in substantial gainful activity since the alleged onset date. (*Id.* 10). The ALJ found plaintiff suffered from the severe impairments of "osteoarthritis, carpel tunnel syndrome, degenerative changes to the lumbar spine, hepatitis C, headaches, and depression." (*Id.*). The ALJ found that while these impairments were "severe" within the meaning of the regulations, they were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, of 10 C.F.R. Part 404. (*Id.*).

After reviewing the medical record and discrediting plaintiff's claims in large part, the ALJ concluded plaintiff retained the residual functional capacity (RFC) to perform a limited range of light work with a sit/stand option. (*Id.* 11). Based on the RFC determination and the testimony of a vocational expert, the ALJ found while plaintiff could not return to his past relevant work of handyman and hearing aid specialist, there were jobs plaintiff was still capable of performing, specifically, cashier, hand packager, and machine tender. (*Id.* 19). Following an unsuccessful appeal of the ALJ's determination (*Id.* 1), plaintiff filed this lawsuit seeking federal judicial review of the denial of benefits pursuant to 42 U.S.C. § 405(g).

II.
ISSUE PRESENTED

In his sole ground of error, plaintiff contends the ALJ's determination plaintiff is limited to a restricted "light" residual functional capacity with a "sit/stand" option is not supported by substantial evidence.

III.
STANDARD OF REVIEW

In reviewing disability determinations by the Commissioner, this Court's role is limited to determining whether substantial evidence exists in the record, considered as a whole, to support the Commissioner's factual findings and whether any errors of law were made. *Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989). Substantial evidence in the context of Social Security determinations "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). That is, substantial evidence "is more than a mere scintilla, and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir.1993).

In assessing the substantiality of the evidence, courts generally focus on four factors: "(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history." *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir.1995). In making this assessment, courts "may not reweigh the evidence in the record, nor try the issues de novo, nor substitute [their] judgment for that of the [Commissioner], even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988). Provided that the correct legal standards are applied, when "substantial evidence supports the [Commissioner's] findings, they are conclusive and must be affirmed." *Spellman*, 1 F.3d at 360.

IV.

MERITS

Plaintiff contends "[i]n making his determination that Mr. Thouvenell can perform a modified range of 'light' work with a 'sit/stand' option, the ALJ appears to be attempting to avoid a 'disabled' finding . . . The ALJ did not properly assess the pain and physical limitations caused by his back problems and carpel tunnel syndrome."  ("Plaintiff's Brief in Support of Claim for Social Security Benefits," doc. 14, pg. 9 (Dec. 18, 2012)).  The Commissioner has responded that, while record evidence indicates plaintiff has some degree of limitations, the ALJ properly accounted for those limitations in his RFC determination.  Consequently, there is substantial evidence in the record supporting the ALJ's determination.

*A.  The Evidence*

1.  Objective Medical Evidence and
Diagnoses and Opinions of Treating and Examining Physicians

The earliest medical evidence in the record is from September of 2008, when a doctor was treating plaintiff for a "herniated disk - lumbar."  (Tr. 211).  The same month, plaintiff went to the emergency room (ER) for back pain.  (*Id.* 209).  An MRI at the ER showed a "5 mm right, posterior paracentral L5-S1 disc protrusion impinging the right S1 nerve root with right, paracentral mild canal stenosis."  (*Id.* 206).  Following the ER visit, plaintiff attended a pain management clinic where he received a series of "[l]umbar epidural steroid injection[s]."  (*Id.* 193-98).

Approximately one year later, in August 2009, plaintiff again went to the ER with back pain.  (*Id.* 222).  A CAT scan done at that time showed "[a] moderate-sized right paracentral and central focal disk herniation at the L5-S1 which is compressing the right-sided L5 nerve root and there is associated moderate spinal canal stenosis at this level which is secondary to this focal disk

herniation plus congenitally narrowed spinal canal, ligamentum flavum hypertrophy." (*Id.* 225).

The CAT scan also showed a "[m]ild disk bulge at the L4-5 level," a "L2-3 level mild disk bulge,"

and a "[f]ocal lytic lesion in the L2 vertebral body which is probably an atypical hemangioma."

(*Id.*). The radiologist recommended an MRI for closer evaluation. The MRI, done two days later,

revealed a "left lateral disk herniation [of] approximately 1.5 mm" at L4-L5 and a 5.5 to 6.0 mm

herniation, which the radiologist described as "[m]oderate to large" at L5-S1. (*Id.* 295).

Following the MRI, plaintiff was referred to a back surgeon, who sent plaintiff to physical

therapy. (*Id.* 291). Plaintiff underwent physical therapy from August 2009 to October 2009. After

physical therapy proved ineffective for long-term pain relief, plaintiff, at the recommendation of

both his back surgeon and his primary care physician, decided to undergo back surgery. (*Id.* 287,

416-18).

In April 2010, plaintiff underwent a discectomy, wherein his bulging disc at the L5-S1 level

of his spine was removed. (*Id.* 623). Following the surgery, plaintiff's back surgeon recommended

plaintiff undergo physical therapy and pain management therapy. (*Id.* 285, 620). By the end of June

2010, plaintiff's physical therapist assessed plaintiff's condition as follows: "Pt. has demo. in his

pain level & overall function. Pt. will benefit from continued [physical therapy] to be progressed

to home exercises." (*Id.* 304). Plaintiff's primary care physician, who oversaw plaintiff's pain

management, also noted, "Extremities have full ROM with intact strength, sensation, and reflexes

with the exception of an absent ankle jerk of the right. No abnormality on gait or stance. He is

walking without a limp. He could walk on toes and heels much better." (*Id.* 478). The primary care

physician began to decrease plaintiff's pain medication. (*Id.*).

By mid-July 2010, the physical therapist indicated plaintiff had met all of his post-operative

goals and no longer needed physical therapy. (*Id.* 298). By mid-August 2010, plaintiff's primary care physician, overseeing plaintiff's pain management, indicated plaintiff was improving following his back surgery and referred him to another physician for continuation of the pain management. (*Id.* 489). When plaintiff went to the new pain management physician, in October 2010 (one month after plaintiff's initial disability applications), he told the physician that his pain had increased over the prior months. (*Id.* 500). The doctor diagnosed plaintiff with chronic pain syndrome and with lower back pain. (*Id.*). The doctor noted:

> [Mr. Thouvenell] did well initially and completed his PT and pain had reduced to 2-3 taking 4-6 Lortab 10 daily. Over the last several months he has seen increased pain and has had pain meds reduced to Lortab 7.5-500, ½ tab twice a day . . . He is able to do his [activities of daily living] but has trpuble [sic] with sitting for any length of time and with drving [sic]. Very difficult [to] put his right shoe on. He has renmained [sic] active by walking 15 minutes daily, but can only go ¼ mile. He does some painting at a local trailor [sic] park, but this is limited.

(*Id.*). The doctor increased plaintiff's pain medication. (*Id.*). A month later, the doctor reported plaintiff had "improved a lot overall since we upped his dose but is not where he would like to be yet." (*Id.* 504).

In January 2011, plaintiff was seen by Dr. William Culver, who was a doctor evaluating plaintiff on behalf of the Commissioner. Dr. Culver noted plaintiff "had increased pain [in his lower back] with extension but he could heel and toe walk and squat and rise without difficulty." (*Id.* 377). The doctor also observed plaintiff's "[r]ange of motion was decreased in all planes but particularly to extension." (*Id.* 378). After evaluating plaintiff, Dr. Culver issued the following statement:

> I have reviewed the medical records and examined the individual and it is my opinion he can perform all of his [activities of daily living] and maintain employment in a sedentary to light duty position avoiding repetitive bending, overhead work, climbing ladders, or walking or standing for long periods.
> This evaluation has been conducted on the basis of a thorough medical examination and review of medical documentation, as provided, with the assumption

that the material is true and correct . . . This opinion is based, therefore, on a clinical
assessment, examination and documentation.

(*Id.* 379).

In March 2011, a physical residual functional capacity study was done on plaintiff by Dr.
James Wright.  Dr. Wright concluded plaintiff was capable of frequently lifting ten pounds and
occasionally lifting twenty pounds.  (*Id.* 399).  Dr. Wright opined plaintiff could stand, walk, and/or
sit for a total of six hours in an eight-hour workday.  (*Id.*).  He imposed no additional limitations on
plaintiff.  (*Id.* 400-04).  Dr. Wright opined plaintiff's allegations were not wholly supported by the
medical evidence of record and endorsed Dr. Culver's assessment that plaintiff could perform
sedentary to light work.  (*Id.* 405).

Later in March 2011, plaintiff was seen by his pain management doctor for a follow-up
appointment.  At that appointment, the doctor indicated they "had not made much progress" in
treating plaintiff's chronic pain syndrome.  (*Id.* 523).  The doctor modified plaintiff's medications
and indicated plaintiff would potentially benefit from epidural steroid injections.  (*Id.*).

In April 2011, plaintiff went to the ER with back pain.  (*Id.* 579).  The ER notes indicate
plaintiff was swinging a hammer at the time the pain started.  (*Id.* 584).  A CT Scan done at the ER
revealed a "[b]road-based disc protrusion at L4-5," "[p]ostsurgical changes at L5-S1 where there
is residual or recurrent disc bulging," and "[n]oncompressive degenerative disc disease L2-3." (*Id.*
579).  Plaintiff was diagnosed with an acute myofascial strain of his lower back, given pain killing
medication, and released.  (*Id.* 595).  The next day, plaintiff contacted his pain management
physician and informed him of the ER visit.  (*Id.* 543).  The doctor wanted to send plaintiff back to
plaintiff's back surgeon, but the surgeon would not accept the referral without a new MRI.  (*Id.* 544).

The pain management physician accordingly ordered an MRI of plaintiff's back.  (*Id.* 550-

51).   That MRI revealed several abnormalities throughout Mr. Thouvenell's spine.   (*Id.*).   In particular, at the L5-S1 vertebra, which was operated on in plaintiff's prior back surgery, the MRI showed "a broad-based area of disk-like signal extending from the right neural foramen-lateral recess junction to the left lateral recess.   Abutment of the intercanalicular portions of the S1 nerve roots is noted bilaterally." (*Id.* 552).   The radiologist's impressions were as follows:

> Is unclear if the broad-based area involving the L5-S1 level is due to residual or recurrent disc herniation versus postoperative changes.   Postcontrast images are needed to better evaluate this region.   All these may have a similar appearance if there is a history of prior surgery.   L4-L5 spinal cana stenosis followed by L2-3. Lumbar spondylosis.   L2-3 disk bulge in addition to the osteophyte-disk complex. L4-L5 osteophyte-disk complex . . .

(*Id.*).   The action plaintiff's pain management physician took in response to these findings, i.e., whether he sent plaintiff back to the back surgeon, is not contained in the record.   There appears to be no additional objective medical evidence nor any physician's statement regarding plaintiff's back after the April 2011 MRI.

### 2.  Plaintiff's Subjective Evidence of Pain and Disability

Plaintiff's complaints are generally in line with the objective medical facts and diagnoses and opinions of his physicians.   Prior to his back surgery, plaintiff consistently complained of severe back pain radiating down his legs.   (Tr. 210, 214, 222, 226, 230-54, 255-56, 287, 290).   Plaintiff indicated the pain "stops me from lifting, bending, standing, and sitting for long periods of time. I can't walk, climb, reach, or handle big objects . . ." (*Id.* 214).   Plaintiff indicated he was unable to walk without experiencing pain.   (*Id.* 226).   Plaintiff attempted both physical therapy and pain medication to bring his back pain under control, but both were unsuccessful, and back surgery was necessary.   (*Id.* 230-54, 645).

Immediately after his back surgery, plaintiff reported his pain was worse than ever.   (*Id.*

285).  He indicated his pain levels increase with walking and sitting.  (*Id.* 286).  Within two months

of the surgery, however, and with the assistance of physical therapy, plaintiff reported his pain was

improving.  (*Id.* 303, 316).  His pain level was at a two out of ten at rest and a four out of ten with

activity.  (*Id.* 303, 321).  Pain was increased by sitting and prolonged standing and was decreased

by rest.  (*Id.* 303).  Within three months of the surgery, plaintiff reported "having much less low

back pain."  (*Id.* 477).  Four months after the surgery, plaintiff again reported his "back pain is

better" and had "improved."  (*Id.* 486-87).  Seven months after the surgery, plaintiff reported he was

doing "a lot of woodworking as well as working on cars."  (*Id.* 509).  He no longer discussed or even

mentioned any back pain to his doctor, at least not to the extent that his doctor made any notations

of it.  (*See id.* 509-10).

It was at this time (seven months after the back surgery) that plaintiff filled out his "Function

Report" for the purposes of his disability claim.  (*Id.* 150-57).  In his report, plaintiff stated he was

"not able to stay on my feet for more than 15 minute[s] before the pain increase[s]."  (*Id.* 150, 151).

Plaintiff also indicated "standing for more than 10 minutes increases pain."  (*Id.* 155).  Regarding

sitting, plaintiff stated, "sitting in a chair for 15 to 30 miniutes [sic] increases pain" (*id.* 151), and

"sitting for more than 20 minutes" caused pain (*id.* 155).  He said, "I can't . . . sit without pain" and

"sitting without some kind of lumbar support increases pain."  (*Id.* 153).  Plaintiff stated he was "just

not able to work like I used to."  (*Id.*).

Within eleven months of the surgery, plaintiff was again reporting experiencing chronic low

back pain at a seven out of ten on the pain scale.  (*Id.* 523).  He indicated the pain worsened with

physical activity.  (*Id.*).  Approximately one year after the surgery, plaintiff was back in the ER

complaining of extreme back pain that was not alleviated by medication.  (*Id.* 581, 583).

At the time of the hearing before the ALJ, eighteen months had elapsed since plaintiff's back surgery.  At the hearing, plaintiff testified his pain is "always there but it increases through the day. And it's unbearable towards the end of the day."  (*Id.* 31).  Plaintiff testified, "[t]he pain it gets pretty bad sometimes.  Even with the medications that I'm on . . ."  (*Id.* 36).  Plaintiff also testified the back surgery "went well" but his back condition was "back to where it was.  If I'm on my leg for too long I, the pain increases . . . From I think it was April, I went back to the hospital because I had hurt my back again and since that day things have just gotten worse for me."  (*Id.* 38).  He stated the longer he stood, the worse his pain got (*id.* 39), and he was "hardly ever" able to sit because of the pain (*id.* 41).  Instead, plaintiff indicated he was frequently bedridden.  (*Id.* 39, 41).

Plaintiff's testimony provided elucidation lacking the record about his course of treatment following the April 2011 MRI.  He testified that following the MRI his doctors had put him on a course of steroid injections.  (*Id.* 40).  He was unsure of what his course of treatment would be following the conclusion of the steroid injections.  (*Id.*).

### 3. Plaintiff's Age, Education, and Work History

At the time he filed for disability benefits, plaintiff was forty-nine years old.  He was forty-seven at the time of the alleged disability onset date.  (Tr. 18, 121).  He completed his education through the twelfth grade.  (*Id.* 143).  His past relevant work was as a handyman and a hearing aid specialist.  (*Id.* 42).

### B. *Substantial Evidence Supports the ALJ's RFC Determination*

The portion of the ALJ's decision contested by plaintiff is the ALJ's RFC determination that "claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he requires a sit/stand option . . ."  (Tr. 11).  In explaining how he reached this

RFC determination, the ALJ stated,

> I have carefully considered the claimant's subjective complaints of pain. However, the objective medical evidence does not fully support the claimant's severe and limiting allegations. Specifically, I note the multiple diagnostic studies that have revealed degenerative changes in the claimant's back. Likewise, I note the claimant had undergone lumber spine surgery and received several epidural steroid injections for his back . . . However, the claimant's examinations . . . subsequent to his surgeries and injections have been largely unremarkable, which seems inconsistent with his allegations of continuing chronic and debilitating pain. Likewise, the claimant told [his treating physician] and his staff on multiple occasions that his medications were helping and he was doing well. Additionally, [Mr. Thouvenell's pain management physician] also noted the claimant's pain improved after a change was made to his medication dosage. Furthermore, I note the claimant told [his primary treating physician] in January 2011 that he was working "a lot" on cars and woodworking.
> . . .
> Despite the above facts I have given the claimant the benefit of all possible doubt concerning the impact of his subjective complaints of pain upon his functional capacity. In doing so, I have limited the claimant to a reduced range of light work, as detailed above. This residual functional capacity is supported by Dr. Culver's opinion, and the sit/stand option was specifically included given Dr. Culver's opinion regarding the claimant's inability to stand or walk for prolonged periods. The objective medical evidence, when viewed in the light most favorable to the claimant, does not warrant additional limitations.

(*Id.* 16). Regarding plaintiff's complaints of pain subsequent to his surgery, the ALJ recognized plaintiff's complaints but found, "[t]he claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (*Id.* 13).

Substantial evidence supports the ALJ's conclusions. The objective medical evidence indicates plaintiff had a herniated disc that required surgery. (*Id.* 287, 416-18). The disc herniation was corrected with surgery. (*Id.* 623). Approximately eighteen months after the surgery, plaintiff again had what appeared to be either a residual or a recurrent disc herniation. (*Id.* 552). Unfortunately, there is no objective medical evidence or physician statement regarding the treatment

of this herniation. The only evidence regarding treatment of the recurrent/new herniation came from the discredited plaintiff, who indicated his doctors were treating the herniation with more steroid injections. Plaintiff was unable, however, to provide any additional insight into what treatment, if any, might be provided following the steroid injections.

Moreover, the diagnoses and opinions of the treating and examining physicians support the ALJ's determination. Specifically, and as referenced by the ALJ, Dr. Culver evaluated plaintiff and opined he was capable of "maintain[ing] employment in a sedentary to light duty position." (*Id.* 379). Dr. Wright reached the same conclusion. (*Id.* 399-405). Plaintiff has identified no medical determination which conflicted with Dr. Culver's or Dr. Wright's conclusions, and the Court has not independently found such evidence. There is no finding by any medical personnel indicating plaintiff is not capable of working due to his back problem. The only conflict in the record is between plaintiff's statements that he is not capable of working due to the pain in his back and the doctors' determinations otherwise.

Pain can constitute a disabling impairment. *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994). However, pain is disabling only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Selders v. Sullivan*, 914 F.2d 614, 618-19 (5th Cir. 1990). By itself, the fact a plaintiff may suffer some pain while working is not enough to support a finding of disability. *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983). Rather, "[p]laintiff must show that he is so functionally impaired that he is precluded from engaging in substantial gainful activity." *Id.* (citations omitted). In determining whether pain is disabling, "the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints." *Falco*, 27 F.3d at 163. The decision whether plaintiff's pain is disabling rests soundly within the discretion of the ALJ. *Hollis v. Bowen*, 837 F.2d 1378, 1387 (5th Cir. 1988).

As recited above, the ALJ found plaintiff's complaints of pain beyond the level of pain accounted for in the RFC determination were "not credible." (Tr. 13). This determination is within the ALJ's discretion, *see Hollis*, 837 F.2d at 1387, and plaintiff has not shown the ALJ's determination was an abuse of that discretion. Two months after the back surgery, plaintiff reported pain after he had helped move a bed. (Tr. 306). Seven months after the surgery, he reported doing "a lot of woodworking as well as working on cars." (*Id.* 509). One year after surgery, when he went back to the ER, he had been swinging a five-pound hammer. (*Id.* 583). As the ALJ pointed out, there is some question about how disabling plaintiff's back pain is if he is capable of performing such manual labor.[1]

In any event, it was within the discretion of the ALJ to accept the objective medical evidence and opinions of treating and examining physicians over plaintiff's subjective complaints. *See Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977). Because every portion of the RFC determination plaintiff challenges has evidentiary support in the form of objective medical tests and diagnoses and opinions of treating and examining physicians, the ALJ's enunciated reasons for denying plaintiff benefits despite his complaints of pain and disability indicate the ALJ did not abuse his discretion. *See Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991); *Anderson*, 887 F.2d at 633. While there is medical evidence documenting the fact that plaintiff sought treatment for his increased pain post-surgery, that evidence is not conclusive.

---

[1] There is some degree of question as to the extent of the injury in April 2011 (one year after the back surgery), as the objective medical evidence indicated the possibility of a new disc herniation. Ideally, there would have been some evidence apart from plaintiff's testimony regarding the details and severity of the injury, the course of treatment and its expected effectiveness, and the long-term implications of the injury on plaintiff's ability to work. However, because the only evidence on that issue came from plaintiff, and because the ALJ largely discredited plaintiff's testimony, there is no objective evidence upon which to rely indicating disability based upon a new injury was justified.

### C.   The Existence of Light-Level Jobs with an Option to Sit or Stand

Plaintiff's main argument appears to be not so much that the ALJ's RFC determination was not based upon substantial evidence but that the ALJ's RFC of light work with an option to sit or stand was inconsistent with the very nature of light-level jobs.

Light work is defined by the Social Security Administration as follows:

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling or arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.2567(b); 29 C.F.R. § 416.967(b).

Plaintiff is correct that the very definition of light work is work "requir[ing] a good deal of walking or standing, or . . . involv[ing] sitting most of the time."  20 C.F.R. § 404.2567(b).  The Social Security Administration has issued special comments on the topic of jobs at which a person can choose to either sit or stand at will:

> There are some jobs in the national economy -- typically professional and managerial ones -- in which a person can sit or stand with a degree of choice . . . However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task.  Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will.  In cases of unusual limitation of ability to sit or stand, a [vocational specialist] should be consulted to clarify the implications for the occupational base.

Rules for Adjudicating Disability Claims in Which Vocational Factors Must Be Considered, 43 Fed. Reg. 55,349, Soc. Sec. Reg. 83-12 (Nov. 28, 1978).

> A job in [the "light work" category] requires a good deal of walking or standing . . . A job is also in this category when it involves sitting most of the time . . . Relatively few unskilled light jobs are performed in a seated position . . . Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may occur

intermittently during the remaining time.

*Id.*, Soc. Sec. Reg. 83-10.

Based upon these comments, there is some validity in plaintiff's argument: the ALJ's RFC determination, which limited plaintiff to working jobs where he has the option to either sit or stand as necessary, seems inconsistent with his determination that plaintiff is capable of performing the listed light, unskilled jobs.

The ALJ, however, did not stop at this point, and it is at this point in the analysis where the vocational expert's (VE's) testimony is critical. At the hearing, the following transpired between a VE and the ALJ:

> Q.    Let's start with light with a sit stand option. Along with the before mentioned limitations.
>
> A.    Yes, sir.
>
> Q.    If you could tell me whether there are other jobs?
>
> A.    Okay, judge with that hypothetical person and it was a sit stand option right?
>
> Q.    Sit stand option.
>
> A.    Okay, there would be a reduced number of cashier II jobs . . . 100,000 U.S., 8,000 Texas, the reduction would be due to the sit stand requirements. Also a hand packager . . . 40,000 U.S., 8,000 Texas. That number also reduced due to sit stand. And a machine tender . . . 20,000 U.S., 2,000 Texas also reduced due to the sit stand requirement.
>
> Q.    Does this conform with the [Dictionary of Occupational Titles]?
>
> A.    Yes sir to the best of my knowledge it does.

(Tr. 44-45). In his decision, the ALJ discussed plaintiff's unique RFC assessment:

> [T]he claimant's ability to perform all or substantially all of the requirements of this [light] level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual

with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as cashier (for which there are 8,000 jobs in the [S]tate of Texas and 100,000 jobs in the national economy), hand packager (for which there are 8,000 jobs in the [S]tate of Texas and 40,000 jobs in the national economy), and machine tender (for which there are 2,000 jobs in the [S]tate of Texas and 20,000 jobs in the national economy).

(*Id.* 19).

Thus, the ALJ recognized plaintiff suffers from additional limitations and properly relied upon the services of a VE in evaluating plaintiff's case. *See Fields v. Bowen*, 805 F.2d 1168, 1170-71 (5th Cir. 1986). As the Fifth Circuit has stated, "[t]he value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed" in the performance of jobs. *Id.* at 1170. The Court gives the VE's testimony a good deal of deference, recognizing not only that the VE is the expert in job requirements but also that the Court's task is to evaluate whether the Commissioner's determination is supported by substantial evidence, not to reweigh the evidence or try the issues *de novo*. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

The VE in this case testified the jobs he determined a person like plaintiff could perform allowed for the worker to have a "sit/stand" option, i.e., to alternate sitting and standing. The ALJ is not only able to rely on the testimony of a VE in matters of specific job requirements and options, but, when the RFC contains limitations beyond those set forth in the Code of Federal Regulations, he *must* rely on the VE's testimony. *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000). The ALJ did not commit error by relying on the VE's testimony.

V.

RECOMMENDATION

For the reasons set forth above, it is the opinion and recommendation of the undersigned

to the United States District Judge that the decision of the Commissioner finding plaintiff GARY

THOUVENELL not disabled and not entitled to disability benefits be AFFIRMED.

VI.

INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and

Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 11th day of September, 2013.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

## \* NOTICE OF RIGHT TO OBJECT \*

Any party may object to these proposed findings, conclusions and recommendation.  In the event
parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days
from the date of filing as indicated by the "entered" date directly above the signature line.  Service is
complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P.
5(b)(2)(E).  **Any objections must be filed on or before the fourteenth (14th) day after this
recommendation is filed** as indicated by the "entered" date.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P.
72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and
Recommendation."  Objecting parties shall file the written objections with the United States District Clerk
and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to
the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party,
except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings,
legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the
district court.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc),
*superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc.
v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).